# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
    )
v.    )       **Criminal No. 17-10180-LTS**
    )
    )
JEREMIAH MINES    )

## GOVERNMENT SENTENCING MEMORANDUM

The government is asking that this Court incarcerate Jeremiah Mines for 14 months. That is the midpoint of what the government believes is the correctly calculated advisory guideline sentencing range. PSR at ¶ 109 (range 12-16 months).   Regardless of how the guidelines are calculated, however, 14 months is a sentence fully justified by the serious nature of: (1) Mines' repeated drug trafficking inside the Orchard Gardens Housing Development ("Orchard Gardens" or "Orchard Park");[1] and, (2) the critical importance of protecting the quality of life of the residents of this development and other nearby areas that also bear the brunt of street level drug trafficking and the violence that so often accompanies it. See Kennedy, "Pulling Levers: Chronic Offenders, High-Crime Settings, and a Theory of Prevention," 31 Val. U. L. Rev. 449, 455 (1997) ("Street drug markets are notorious sources of violence, disorder, prostitution and other problems. Mark Klieman notes that hard core cocaine and heroin users, while numbering no more than three million nationally, commit crimes at very high rates; that three-quarters of them are likely to be arrested in any given year; and that they are likely to be on bail, probation, or parole when not actually incarcerated").

---

[1] The Development was re-named Orchard Gardens when it was redeveloped in about 1999 by the BHA and two private developers utilizing HUD financing. Many still refer to the development as "Orchard Park."   The two terms will be used interchangeably here.

The government is also asking that the Court impose the minimum six years of Supervised Release required by 21 U.S.C. §860 and that this period be accompanied by special conditions that will both assist the Defendant upon his release and protect the residents of these ravaged neighborhoods.   Those special conditions include a narrow geographic restriction that will keep Mines out of the area immediately contiguous to Orchard Gardens and an Associational restriction that will keep him away from his historic criminal associates and fellow members of the Orchard Park Trailblazers street gang.   Given "the nature and circumstances surrounding his offense," and the "history and characteristics of the Defendant," a sentence of 14 months that incorporates the requested special conditions fully complies with the factors set forth in 18 U.S.C. § 3553(c), reflects the profound impact that street level drug trafficking has on inner-city communities, takes into consideration that the Defendant committed a gun offense as a juvenile (when he brought a firearm to middle school), was injured in 2012 when he became involved in a high speed chase in which his car was shot up and ended up crashing into a concrete wall, has compiled 6 D-Reports during his current incarceration that include 2 fights with rival gang members, has a long history of domestic violence issues and acts of violence against the police, and has been a longstanding fixture in the Orchard Gardens Development abusing both the neighborhood and its residents.   See Presentence Report ("PSR") at ¶ ¶6 (current D-Reports), 57 (determination of delinquency arising out of Mine bringing a gun to Middle School that he then pointed at a victim following a fight that took place before school) 82 (referencing pending Assault and Battery case involving his current girlfriend)   ¶ 92 (Defendant shot once in 2009).   See also BPD Reports at 3, 4, 5, 17 (Domestic violence issues)(attached as Exhibit 1); Detention Affidavit of BPD Detective Gregory Brown ("Detention. Aff") at ¶¶ 46-49

(Information on Mines that includes he has 155 FIOs, many of which took place inside the Development and/or with other Targets)(attached as Exhibit 2).

## I.      <u>THE INVESTIGATION</u>

In late 2015, the Bureau of Alcohol, Tobacco & Firearms ("ATF") and the Boston Police Department ("BPD") commenced an investigation into gun and drug trafficking directed principally at dealers operating in the Orchard Gardens Housing Development and surrounding areas of Roxbury's Dudley Square and members of the Orchard Park Trailblazers street gang. <u>See also</u> Detention Affidavit at ¶ ¶ 21-25 (describing investigation); PSR at ¶ ¶ 9-12 (same).

The Orchard Park investigation was launched for two principal reasons. The first is the high concentration of serious crime in and around the Orchard Park/Orchard Gardens Development. Although overall crime in Boston has fallen significantly in recent years, a review of data specific to Orchard Park and the surrounding area shows that the Orchard Gardens Development continues to suffer from a disproportionate amount of shootings and street robberies as well as firearm and drug related arrests.   Specifically, statistics compiled by BPD's Boston Regional Intelligence Center ("BRIC") relative to these crime categories since the beginning of this investigations show that between January, 2015 and April, 2017, BPD has recorded the following crimes as having taken place either inside or within 500 feet of the Development: one fatal and ten (10) non-fatal shootings; eighteen (18) firearm arrests; eighty (80) drug arrests; and fifty-one (51) robberies. <u>See</u> Detention Affidavit, ¶ 14 (Exhibit 2).

In addition to the amount of crime, its concentration in and around the Orchard Gardens/Orchard Park Housing Development is also a concern both to the Boston Police Department and to many area residents.   Attached to the Detention Affidavit as Exhibit 2 are

maps prepared by the Boston Regional Intelligence Center that depict the geographical locations

within District B-2 where the highest concentration of drug and firearm offenses, shootings and

street robberies have occurred for the same period.   In every category identified (shootings,

robberies, firearm arrests, and drug arrests) the area in and around the Development is associated

with area B-2 hotspots.

Of course, crime committed in and around the Development is not limited to the major

crime categories already discussed. In addition, residents of the Development are also confronted

with quality of life offenses such as trespassing, public drinking and drug use, disorderly conduct

and prolific use of (mostly illegal) dirt bikes or other public disturbances.   Most of these crimes

are committed by individuals (many of whom are associated with the Orchard Park Trailblazers

or other area gangs)[2] who persistently hang around the Development in large groups often taking

over street corners, front stoops, play areas, parking lots or even entire streets, thereby forcing

residents to go around them to get to their homes. Police vehicles are often challenged when they

go into the Development by these crowds. Attached to the Detective Brown's Detention

Affidavit as Exhibit 3 are still photos taken from some of the buys and stills from BPD body

cameras that reflect these conditions.

Orchard Park residents frequently express concerns to the leadership of District B-2 and the

beat officers who routinely patrol the Development for their safety and the quality of life within

---

2  Much of the criminal activity described above is attributed to individuals associated with the
Orchard Park Trailblazers.   The Orchard Park "Trailblazers" consists of approximately sixty-six
(66) members and associates that have been verified by the Boston Regional Intelligence Center
("the BRIC").   No less than 12 of the 13 Targets to this investigation (including Mines) are
identified as members of Orchard Park or VNF, another area gang.   Mines is an identified
member of the Orchard Park Trailblazers as demonstrated by his BPD gang database information
as well as the "Blazers" tattoo he sports on his right hand.   PSR at ¶ 91.

their community.   Complaints of groups of young males (often individuals who may have grown

up in the area or have relatives in the area but who themselves now live outside the

Development) congregating in front of residences, in courtyards, and within the playgrounds of

the Development are commonplace.   Orchard Park gang members persistently utilize areas

within the Development as open-air drug distribution markets, and are often themselves seen

consuming marijuana and alcohol in public.   This has led to an atmosphere of fear and

intimidation among the communities' residents.[3]   Both the buys that were made and surveillance

conducted during the course of this investigation have corroborated these complaints.   See

Detention Affidavit, Exhibit 3 (still frames from charged buys and BPD Body Cameras that

reflect crowds of young men who frequent the Development to hang out, use drugs and drink,

sell drugs and commit other "quality of life" offenses).   Although the defendant here was not

captured in any of these still photographs, BPD records reflect that Mines has 155 FIO's, more

than 125 of which were inside or in the immediate area of the Development and nearly 50 were

conducted while Mines was in the company of other Targets to this investigation.   Detention

Aff., ¶¶ 49-50.

---

[3]  Among other things, it is believed that the constant presence of these individuals can leave
residents afraid to place calls for police service, thereby leading to under-reporting of crime, such
as large groups congregating/trespassing in courtyards and in front of residences for the purpose
of, among other things, distributing and using narcotics.   See Detention Affidavit at ¶17 note 3.

    In addition, when members of local street gangs, such as the Orchard Park Trailblazers,
consistently congregate in large groups and in the same areas, they put themselves (and everyone
else in the area) at an increased risk of being victimized by firearm violence committed by rival
gangs.   This is due to the simple fact that since Orchard Park members have become easy to
locate, and thereby have made themselves easier targets.   Unfortunately, circumstances such as
these often leave the many law-abiding residents of the Development and their families at an
increased risk of being becoming the unintended victims of such violence. Id.

Incidents such as those reported herein continue to plague Orchard Gardens in spite of the concerted efforts of the Boston Police Department to proactively patrol in the Development. Known Orchard Park members and associates are routinely encountered by officers assigned to District B-2 and the Youth Violence Strike Force.   However, as is most often the case during these encounters, the officers are left with little to no enforcement options if the encounter does not rise to the level of arrest; the encounter is documented on a field interrogation, observation and/or frisk report ("FIO") and these individuals are free to stay in the community.[4]

To address the crime and quality of life issues at Orchard Park, ATF partnered with members of BPD's Special Investigations Unit ("SIU") in this investigation.   Its principal goal was to attack drug and firearms trafficking in and around the Development with specific emphasis being placed on street-level drug dealers and Orchard Park Trailblazers who use the Development as their base and thereby adversely affect quality of life issues for the Development's residents for all the reasons already described.

Cooperating witnesses ("CW's") were utilized during the investigation.   The CW's (who were strangers to the area and to the Targets) were deployed by investigators in and around the Development. Notwithstanding the CW's lack of familiarity with both the Development and the Targets, they made a total of 46 gun and drug buys between October 2015 and May 2017.   All of the buys (and many conversations leading up to the buys were recorded) with the buys and other meetings being recorded on videotape.

---

3    Even when the quality of life offenses described herein lead to arrests, the resulting criminal charges often carry little or no consequences in busy courts focused on offenses that are admittedly more serious.

## JEREMIAH MINES' INVOLVEMENT IN THE INVESTIGATION AND IN THE ORCHARD GARDENS AREA[5]

The government believes that Jeremiah Mines is one of the individuals who has contributed to the crime and has helped damage the quality of life for Orchard Gardens' residents. Mines is identified as being associated with the Orchard Park Trailblazers by his gang tattoo, by BPD's Boston Regional Intelligence Center and by his BPD Incident Reports and FIO's that show him to have been be a regular presence in and around the Orchard Gardens Development.[6] Specifically, Mines has either been FIO'd or captured in Incident Reports as being in the company with the following OP members who were also Targets in this investigation: Diamond Brito, Daiquan Lucas, Jaylin Hawkins, Andre Parham-Rankin, Raul Williams, Raymond Gaines, Lynden Scott, and Tyree Draughn.   Copies of Mines's historic reports and FIOs are attached as Exhibit 1.[7]

The Defendant's real connection with the Orchard Gardens Investigation, however, comes from the five videotaped crack sales (two charged, and three uncharged relevant conduct) he made while in the area of the Development. PSR at ¶ ¶ 15-27 (November 13, 2015 charged

---

[5]  Facts from this section of the Memorandum come from the un-objected to provisions of the PSR and Detention Affidavit attached as Exhibit 1.

[6] The government notes that, in the recent case of United States v. Cortes-Medina, 819 F.3d 566 (1st Cir. 2016), the First Circuit expressed concern over a sentencing court's reliance on a "record of multiple arrests and charges without convictions unless there is adequate proof of the conduct upon which the arrest or charges were predicated."819 F.3d at 570.   Here, the government is not relying on the mere fact of arrests that did not mature into convictions but rather only on the location of arrests and other interactions the Defendant has had with the police in the area of Orchard Gardens that are also supported by contemporaneous police reports.

[7]  As set forth above, BPD records indicate that Mines had been FIO'd 155 Times.   Detention Aff., ¶ 50. Since 1/1/5, that included nearly 50 FIOS that took place in or around the Development when Mines was in the company of other Targets, found in groups as large as large as 19.

sale); 28-37 (March 8, 2016 charged sale); 38 (uncharged buys dated October 22, 2015, November 16, 2015, and February 11, 2016).   The CW was able to make these buys even though she did not know Mines and had no prior contact with him prior to their first deal in October, 2015.   Mines also facilitated the multiple sales he made to the cooperating witness both by giving her his telephone number and simply by being around whenever he was needed.

The other way in which the Defendant has targeted himself in this investigation was his participation in activities at or near Orchard Park that, while less serious that drug trafficking, still adversely affected the quality of life for the families that call the Orchard Gardens Development their home.   The government has already shown the persistent connection between the Defendant's interaction with the police and the Orchard Gardens Development.   See discussion at pp 1-3.   The persistent, brazen nature of these activities shows the indifference that Mines and his fellow Targets and gang associates have to the rights of the lawful residents of the Orchard Gardens Development who merely wish to provide a safe and positive environment for their families.

## THE DAMAGE DONE BY DRUG TRAFFICKING

Drug trafficking like that undertaken by Jeremiah Mines thus has many victims. While it obviously affects the direct users of the drugs, the resulting misery goes much deeper. Spouses, significant others, children, relatives, friends, employers and communities as a whole all feel the sting of crack cocaine, heroin, and the other illegal drugs in their midst day after day, both in the effects the drug has on individual users and the impact that drug dealing (and the violence it has been shown to breed) has on the quality of life in ways outsiders may find difficult to appreciate.

As prosecutors, it is difficult to find spokespersons for the damage that crack and heroin

dealing does.    It is usually impossible to locate specific victims, much less induce them to

speak. So we are forced to rely on our own common sense and to look to what community

leaders and academics tell us about living in neighborhoods that are almost in the shadow of this

Courthouse but that must sometimes seem like they exist a different world.

      One voice that has been heard about the effect of all this on our communities is the Rev.

Eugene Rivers, former head of the Ten-Point Coalition and the current director of the Ella J.

Baker House.    Shortly after the infamous quadruple murder in Mattapan in 2010 (which was

ultimately tied back to drug trafficking), Rev. Rivers was interviewed on WBUR about the mood

of the communities in which the murders occurred.    The government offers his comments, not

to criticize anyone involved in the criminal justice system, but because they poignantly express

the outrage many in that neighborhood felt:

> The Clergy have to be clear that, if you do the crime, you have to do the time.    We no
> longer rationalize or make excuses for over-the-top, out of control, unacceptable
> behavior.    The Black Church must take the hard line that, if you do the crime, kid, you
> should go to jail.    The Black Churches have to challenge the judges to stop coddling
> criminals and then putting them back on the streets to wreak havoc in the Black
> Community. That is absolutely correct.[8]

Reverend Rivers is not the first inner-city resident to recognize the havoc that a small minority

involved with drugs and drug-related violence can have on entire communities visible only in

times of tragedy but who live with the reality of street dealers like Mines every day.    See also

Donald Braman, "Criminal Law and the Pursuit of Equality," 84 Tex. L. Rev. 2097, 2098 (2006)

("Despite the Constitution's guarantee to equal protection, it is fair to say that today most black

Americans feel neither equal under nor protected by our criminal laws. The effects of under

enforcement are devastating:    Many people living in our nation's inner cities no longer feel safe

---

[8] A copy of the CD containing these remarks will be available at sentencing.

walking through their own neighborhoods."); article also discussed the results of a 1996 study

that showed that a majority of Black Americans "are afraid to walk alone at night near their own

home"); Tracey L. Meares & Dan M. Kahan, "When Rights Are Wrong," in Urgent Times:

Policing and Rights in Inner-City Communities 3, 4 and 15 (Joshua Cohen & Joel Rogers eds.,

1999) (describing how the building search policy of the Chicago Housing Authority was

declared unconstitutional over the objections of the community residents whose constitutional

rights were supposedly being protected and noting that "instead of shunning the police, inner-city

residents are demanding that police give them the protection they have historically been

denied.").

More recently, a judicial voice joined the conversation about the seriousness of drug

offenses and what they do to communities:

The drug crimes prosecuted in the federal courts are always violent, and I mean that
literally. When you distribute a substance that you know is poison to another person that is a
violent act. Period. End of story. Moreover, the connection between guns and drugs is beyond
dispute. Not every purveyor of drugs uses or carries a gun, but the world where they operate
organizes around one thing and one thing only, guns.   Still further, whole neighborhoods that
were once rich, vibrant and nurturing are now literal war zones because of drugs.   In large
swaths of America, functional families are no more because of drugs.   Like global warming,
these are inconvenient truths.

To be sure, addiction and poverty drive many offenders and those factors often
substantially lessen (or should substantially lessen) a federal offender's culpability.   And, I
certainly agree that statutory mandatory minimum sentences make little sense and have resulted
in federal prison sentences that are far, far longer than are wise or just.   In that same vein, I
strongly support those who want to lessen the number of people we put in federal prisons.

But, I am also a legal realist.   To say that federal drug crimes are "non-violent" is
bullshit–plain and simple.

The Honorable Richard G. Kopf, District Judge District of Nebraska (September 8, 2013)

available at "Hercules and the Umpire. The Role of the Federal Trial Judge" available at

http://herculesandtheumpire.com/2013/09/08/no-more-bullshit-in-the-federal-courts-there-is-no-such-thing-as-a-non-violent-drug-crime/.

Notwithstanding all these observations, the simple fact is that there is still a disconnect in many drug sentencings.   On the one hand, some courts have made it clear that they have been troubled by the drug guidelines and do not consider street-level trafficking to be a serious crime.   E.g., United States v. Haynes, 557 F. Supp. 2d 200 (D. Mass. 2008). These concerns have been expressed irrespective of either drug weight (which has been described as "an unsatisfying and empty stand-in for the concerns underlying our current sentencing regime") or the frequency with which illegal drug sales are made.   Id.   See also United States v. Garrison, 560 F. Supp. 2d 83, (D. Mass. 2008) (stating that sentencing calculations in drug cases "more often reflected the happenstance of when the police happened to be on a given corner or for how long the police surveilled them").   Thus, advisory guidelines can be pushed aside despite the damage street trafficking causes and the clear correlation between low-level drug trafficking and violence. See generally United States Sentencing Commission, "Cocaine and Federal Sentencing Policy," (May, 2007) at 86 ("According to [Professor Alfred] Blumstein, the [40% reduction in national violence since 1993] is attributable to a reduction in new users of crack cocaine and a consequent reduction in the crack cocaine street markets."); Johnson, "Patterns of Drug Distribution: Implications and Issues," 38 Substance Use and Misuse 1795 (2003) cited by the Sentencing Commission for the proposition that "almost all crack cocaine related violence of the 'systemic' type, that is violence that occurs within the drug distribution process.").

## II.      AGGRAVATORS FOR JEREMIAH MINES

Undoubtedly, the Defendant in this case will point to the small amount of purchased from him as a factor that warrants a sentence lower than that sought by the government. Any such argument is misguided in the particular facts of this case.   PSR at ¶ ¶ 18-19. Mines' crimes are thus exactly the kind of street level trafficking that tends to breed violence in various and all too familiar ways.   See discussion at page 1, above (article by Prof. David Kennedy correlating street drug markets with a wide range of criminality). They are also aggravated by several factors discussed below.

### A.      The repetitive nature of drug trafficking.   The first thing that aggravates

the seriousness of the offense of conviction is the repetitive nature of Mines' crimes. Mines' did not sell drugs in and around Orchard Gardens once; he did it five times over a five-month period.   While we will never know the full extent of Mines' crack dealing, his readiness to sell crack cocaine to strangers while simply standing around the Orchard Gardens Development and doing so here five times in five months here shows his crimes to be more serious than someone who made but a single sale even though the overall drug amounts remains small. See also United States v. Schmude, 901 F.2d 555, 559 (7th Cir. 1990) ("[r]ationally, if a defendant has been convicted for the same offense more than once, he has demonstrated the need for greater sanctions to deter him from committing that same crime again-greater sanctions than might be required for a defendant who has never been convicted of a similar offense.").[9]

---

9  Although this evidence is not readily convertible into amounts of crack cocaine that can be attributed to the Defendant under USSG §2D1.1, it confirms that Mines' trafficking went beyond the drugs on the charged sales. The government therefore asserts that the requested sentence of 14 months—2 months above the low end of the mandatory minimum set by Congress—to be a reasonable and appropriate one in order to punish Mines, protect

**B.**     **Mines chose to sell his drugs inside a Public Housing Development.**

Another aggravator in this case is that Mines chose to sell his crack cocaine inside a public

Housing Development, "preying on those most vulnerable to the ills of drug addiction."

United States v. Jenkins, 2009 WL 1444438, *4 (E.D. Pa. 2009.   Accord, United States v.

Gibbons, 553 F.3d 40 (1st Cir. 2009) (affirming sentencing judge's refusal to vary where

Defendant was dealing drugs in inner city housing project).   See also United States v.

Blaso, 2008 WL 227863, *3 (3rd Cir. 2008) (affirming sentence that recognized the

"catastrophic consequences of crack dealing"); United States v. Taylor, 2007 WL 1224045,

*5 (7th Cir. 2007) (affirming crack sentence based on, among other things, judge's

recognition that "that crack dealing is a serious crime because crack is highly destructive to

its consumers").   In view of all this, a sentence slightly above the low end of the guideline

range in this case is therefore appropriate.

**C.**     **Mines' Gang Involvement**

Another aggravator in this case is the defendant's involvement with the Orchard

Park Trailblazer's Gang.   Mines has not even attempted to dispute his gang membership.

Given his "Blazers" tattoo and longstanding record of offending in the Orchard Gardens

Development, his concession is well taken.

Gang membership is an important marker for recidivism and statistically puts Mines

---

his community, and to deter both him and others from engaging in similar conduct both
inside Orchard Gardens or elsewhere in this embattled neighborhood. See United States v.
Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (recognizing that economically based
crimes–as drug trafficking is here–are "prime candidates for general deterrence"); 18
U.S.C. § 3553(a)(2)(B) (the district court may impose a sentence "to afford adequate
deterrence to criminal conduct").

13

in the midst of Boston's gun violence. See Huebner, et al., "Gangs, Guns, and Drugs: Recidivism Among Serious, Young Offenders" Criminology & Public Policy Volume 6 Issue 2 (2007)("Gang membership, even within a high-risk sample, emerged as a significant predictor of recidivism as more traditional risks for offending, such as gun use, demographics, prior convictions, and community disadvantage, did not").[10] Accord, Kennedy, "Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction (Routeledge Studies in Crime and Economics 2009), p. 78 ("There is an embarrassment of riches on the high rate of gang offending"); United States v. Johnson,184 Fed. Appx 746, 748 (10th Cir. 2006)(at sentencing, gang membership was "significant and appropriate for inclusion in the PSR because. . . . gang members are more likely to engage in criminal activity and perhaps related violence than ordinary citizens"); United States v. Aguirre-Roche, 305 Fed. Appx. 567 (11th Cir. 2008)(district court properly considered defendant's gang membership at sentencing);   United States v. Hernandez-Villanueva, 473 F.3d 118 (4th Cir. 2007)(imposing above-guideline sentence based on defendant's gang activities).

**D. Mines' Prison Misconduct**

Mines' gang involvement also appears to have resulted in prison misconduct that provides additional elements that must be considered at Sentencing.   At paragraph 6 of the

---

10  Mines' BPD Reports reflect three incidents that are especially troubling and seem logically related to both his gang membership and concerns about future recidivism, particularly if he is allowed to return to the Orchard Gardens area.   The first was his shooting in 2009. PSR at ¶92.   The second is the incident in 2012 when he was involved in a high speed chase (with both his child and her mother in his car) with another car that fired shots that resulted in Mines crashing into a concrete wall and all three occupants of the car being injured)   BPD Report at page 12.   The third is a 2013 incident in which members of BPD's Orchard Gardens Safe Streets team found Mines and a group of other males who appeared to be hiding behind a dumpster after they had already been warned about trespassing.   When offices arrested the group, they recovered two firearms from the area where they first saw the group.   Id. at 13.

PSR, Probation has listed six disciplinary reports that Mines has amassed since being incarcerated in this case last June.   They include what appears to be an unprovoked attack on Damien Galloway, another federal pre-trial detainee who is a known H-Bloc member and thus a rival to Orchard Park and Mines. PSR at ¶ 6.   The PSR indicates that Mines also fought with another inmate named Terrance Johnson about a month later. BPD has also identified Johnson as an H-Bloc member. During both fights, Mines disobeyed orders to stop and had to be restrained by correctional officers as he continued to fight, even after his victims had already stopped (that apparently gave Mines the opportunity to keep kicking him).   Such behavior also aggravates the seriousness of the person before the court.   E.g., United States v. Keys, 899 F.2d 983 (10th Cir. 1990) (prison disciplinary problems justified upward departure). See also 18 U.S.C. §3553(a)(1)(C) (mandating that sentencing court consider the need to protect the public from further crimes of the defendant); Camp, "Criminogenic Effects of the Prison Inmate Environment on Inmate Behavior: Some Experimental Evidence" (available at www.bop.gov/news/research_projects/.../camp_gaes_c&d.pdf )

(noting that "there are logical reasons and empirical evidence to suggest that prison misconduct is associated with recidivism" and that, in BOP Initial Custody Classification, "the history of prison misconduct also had an independent effect in predicting arrests for released inmates").[11]

---

11    It is the government's belief that these issues, and the defendant's hostility to the police and domestic violence issues demonstrated in his BPD Reports may have their root in anger management issues that could be exacerbated by mental health concerns.   These issues also need to be addressed by Special Conditions for Supervised Release.   See discussion, below,

## SUPERVISED RELEASE[12]

The government also believes that the Defendant should be placed on supervised release for the minimum period of 6 years and that his supervised release should include special conditions designed to help ensure that the Defendant does not revert to his past ways in order to protect the community and protect the Defendant from himself.

### A.    The Defendant should be required to reside at an RRC if finds a suitable residence is not available

Based on the PSR, it does not appear that that the Defendant will have a viable residence upon release.   He should therefore be required to stay in a Residential Center for 6 months or until a suitable residence is found. The government recommends that the RRC be located outside of Boston.

### B.   Curfew

The government also recommends that the Defendant be subject to a 9 p.m.-7a.m. curfew for the first 12 months of supervised release after he is released to the street.   See, e.g., "Maximum Impact: Targeting Supervision on Higher Risk People, Places and Times," Pew

---

12  Any plan designed to give the Defendant the maximum chance at fundamental life change must of course begin with the terms and conditions of his incarceration. E.g., United States v. Gautier, 590 F. Supp. 2d 214, 235 (D. Mass. 2008) (Gertner, J.) ("I have required Probation to devise a recommended plan for him, both as a recommendation for the Bureau of Prisons during the period of his incarceration and as a template for his supervised release afterwards.   Studies suggest the significance on recidivism of a consistent plan, beginning in prison and extending into reentry.   Laurie Robinson & Jeremy Travis, 12 Fed. S.R. 258 (2000)").   But for the fact that Mines will soon be eligible for release, the government would be requesting that the Court make   recommendations to the Bureau of Prisons that the Defendant be given any available substance abuse/mental health/ anger management counseling and any available vocational training (so that he may have increased job skills when he is released). These issues are addressed below.

Center for the States Public Policy Brief (March, 2009) (concluding that Probationers are "at the highest risk of re-arrest during the first few months on community supervision," that arrest rates after 15 months were substantially lower, and thus recommending that probation resources be "front end loaded" to achieve maximum effect).   The Probation Office should have the power to relax the curfew (which should be enforced by electronic monitoring) for school or employment.

<strong>C.   <u>Substance Abuse Treatment</u></strong>.

The Defendant should be tested for drug use and be required to go to drug counseling if directed by Probation.   <u>See</u> PSR at ¶ 97-101 ( historic drug use and interest in treatment).

<strong>D.   <u>Mental health/anger management counseling</u></strong>.

The Court should require that the Defendant participate in mental health/anger management counseling if directed by Probation. <u>See</u> PSR at ¶ 93-95 (mental health history); BPD Reports attached as Exhibit 1.

<strong>E.   <u>Associational and Geographic Restrictions</u></strong>

The government believes that Associational and Geographic Restrictions will help to assist Mines upon his release from prison.   Copies of the restrictions are attached as Exhibits 3 and 4.

The rationale for such restrictions has been explained as follows:

> Recidivism is due to offenders' retaining criminogenic motivation or propensity and their having access to opportunities for crime.   Thus, to reduce re-offending, an important task for a probation or parole agency is to provide or place offenders into treatment programs, based on the principles of effective rehabilitation, that diminish their propensity for crime.   *The other task, however, is for probation and parole officers to reduce offenders' access to crime opportunities.*

Cullen et al, "Environmental Corrections–A New Paradigm for Effective Probation and Parole Supervision" 66 Federal Probation 28 (2002) (hereinafter referred to as "Cullen")(emphasis

17

supplied).   Because both the literature and common sense show that opportunities for crime will be presented whenever a Defendant returns to the area in which his offending began and grew (and in which his street credentials and sense of self may have been based on that very criminality), removing him from that area can reduce both the opportunities for further crime and the expectation from those around him that he will re-offend.   Thus, "[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . . reduce the extent to which offenders are tempted by and come into contact with opportunities for crime."   Id. at 31. See also La Vigne et al., "Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, Mar. 2006, at 25 ("most potential offenders are not highly motivated to commit crime but do so when they are presented with opportunities to offend easily."); Dickey et al, "Promoting Public Safety: A Problem-Oriented Approach To Prisoner Reentry in Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, May 2004, at 61-62 ("when offenders first reenter communities, they themselves are vulnerable, for all of the reasons that have been suggested in literature on reentry: mental health problems, lack of family connections, drug and alcohol addictions, lack of education and employment. . .Fixing these problems is often implausible. . . .Instead, we can alter environments [and] remove temptations. . . ").

As commonsensical as these notions are, effective implementation is equally straightforward.   Rather than the rely exclusively on the sweeping provisions set forth in U.S.S.G. §5D1.3 (c) (8-9) (which, among other things now require the Defendant to know that the individual with whom he is associating has a felony conviction), the literature suggests that

narrower restrictions are more effective--restrictions precluding the Defendant from being with particular, identified people or specifically delineated areas that the record shows have previously led him into crime. Cullen at 33 (recommending that probation officers attempt "to disrupt routine activities that increase crime opportunities" that are based on the Defendant's past offending by, among other things, prohibiting contact with specific people (e.g., past co-offenders) and "prohibiting traveling on specific streets" (e.g., areas of past criminality outlined on a map given to the offender). That is exactly what the government seeks to do here.[5]

Of course, the government cannot advocate such restrictions without establishing their appropriateness.   Appellate courts have routinely upheld such restrictions as a condition of probation or supervised release whenever, as here, the restriction served as a deterrent to protect the victimized community and/or rehabilitate the Defendant based on his prior offending.  See United States v. Garrasteguy, 559 F.3d 34 (1st Cir. 2009) (affirming on plain error review 12-year restriction from Suffolk County imposed on Defendant who sold drugs at Bromley Heath Housing Development);  United States v. Watson, 582 F.3d 974 (9th Cir. 2009)(validating restriction that prevented Defendant from entering city and county of San Francisco without the prior approval of his Probation Officer); United States v. Cothran, 855 F.2d 749 (11th Cir. 1988) (validating a probation restriction that prevented Defendant, convicted of cocaine distribution to minors, from traveling to Fulton County, Georgia, because his return to a high-crime

---

[5]  In a presentation made to the Boston Bar Association, the Probation Department publicly stated that "associates and attitudes" are the two most important indicators or recidivism. While a Defendant's attitude can be harder to change in the short term, (but can be helped by training like the Moral Reconation Therapy Program offered by Probation and to which Mines should be referred), access to criminal associates can be restricted by exactly the type of associational and geographic restrictions sought here and frequently imposed in other similar cases.

neighborhood in southeast Atlanta would likely result in his continued criminal activity and the

endangerment of neighborhood youth); United States v. Sicher, 239 F.3d 289, 292 (3d Cir. 2000)

(upholding a supervised release restriction, after various drug convictions, that covered two

counties in the Allentown, Pennsylvania, area because the "territorial limitation [was] clearly

intended to promote [Defendant's] rehabilitation by keeping [Defendant] away from the

influences that would most likely cause her to engage in further criminal activity").[13]   See also

United States v. Alexander, 509 F.3d 253, 256-57 (6th Cir. 2007) (affirming condition of

supervised release that required Defendant to live in city several hundred miles away from

family for first 12 months of supervised release; court noted that condition: (a) "will further

[Defendant's] rehabilitation efforts by temporarily removing him from the destructive influences

that have plagued him;" and (b) "holds the potential to protect the community from future crimes

as well"); 18 U.S.C. § 3563(b)(6) (authorizing conditions that a Defendant refrain from

associating unnecessarily with specified persons) & 13 (authorizing conditions that a Defendant

---

[13]In approving the much broader geographic restriction imposed in Garrasteguy, the First
Circuit described the legal framework for such conditions as follows:

> District courts have significant flexibility to impose special conditions of
> supervised release.   A district court may impose as a condition of supervised release
> most discretionary conditions identified in 18 U.S.C. § 3563(b), or any other condition
> the court deems appropriate. All such conditions, however, must be "reasonably related"
> to the factors set forth in § 3553(a), may involve "no greater deprivation of liberty than
> reasonably necessary" to achieve the purposes of §§ 3553(a)(2)(c), (a)(2)(D), (viz. to
> protect the public and promote the rehabilitation of the Defendant), and must be
> consistent with any pertinent policy statement of the United States Sentencing
> Commission. 18 U.S.C. § 3583(d); see also United States v. York, 357 F.3d 14, 20 (1st
> Cir.2004).

559 F.3d at 41 (footnotes omitted).   A court should also explain the reason for imposing the
conditions and, in doing so, discuss how they relate to the statutory sentencing factors contained
in 18 U.S.C. §3553.   See United States v. Thompson, 777 F.3d 368, 373-74 (7th Cir. 2015).

refrain from residing in a particular area).

The requested restrictions should also be imposed here because the need for them is fully supported by the record. Even Mines has recognized that going back to Orchard Gardens makes no sense.   PSR at ¶ 79 ("[T]he defendant does not believe that returning [to his prior residence inside Orchard Gardens] would be beneficial to him").[14]

The restrictions are based on Mines' prior criminal contacts as shown on historic Boston Police Department Reports or FIOs (all of which were disclosed to the Defendant at the outset of the case) and a map showing where those incidents took place accompanies both the Summary of BPD Reports and the Geographic restriction itself.   All of the persons on the Associational list are individuals who BPD records show Mines was associating with usually in the very same area.   Almost all have either felony convictions or are listed on the BPD Gang Database and are therefore persons with whom Mines should not be associating with upon his release if this proceeding is going to be successful in convincing the Defendant that his offending has to change if he is to avoid spending a substantial portion of his life behind bars.

### F.   Other Recommendations.

Other recommended special conditions include continued education/vocational training, that the Defendant be required to participate in Probation's MRT Program as directed by his Probation Officer, and that the Defendant receive a judicial recommendation for RESTART.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By: /s/John A. Wortmann, Jr.
JOHN A. WORTMANN, JR.

21

Assistant U.S. Attorney
One Courthouse Way
Boston, MA
(617) 748-3207

## <u>CERTIFICATE OF SERVICE</u>

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/s/ John A. Wortmann, Jr.   1/2/18
JOHN A. WORTMANN, JR